

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-12-00405-CR**
**NO. 02-12-00406-CR**

WILLIAM ADRIAN ROBERTS                 APPELLANT

V.

THE STATE OF TEXAS                         STATE

----------

## FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY
### TRIAL COURT NOS. 1215147D, 1215148D

----------

## OPINION

----------

### I. Introduction

Appellant William Adrian Roberts appeals his convictions for possession with intent to deliver a controlled substance of four grams or more but less than 200 grams (methamphetamine) and possession with intent to deliver a controlled substance of 400 grams or more (gamma hydroxybutyrate), for which the trial

court sentenced him to concurrent sentences of seventeen years' confinement. We affirm.

## II. Suppression

In two points, Roberts complains that the trial court erred by denying his motion to suppress because his vehicle was unlawfully seized, impounded, and inventoried by the Arlington Police Department (APD) in violation of the Fourth Amendment and article I, section 9 of the Texas Constitution.[1]

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v.*

---

[1]We will address these points together. *See Limon v. State*, 340 S.W.3d 753, 757 n.15 (Tex. Crim. App. 2011) (stating that when appellant alleged violations of both the Fourth Amendment and article I, section 9, but did not argue that article I, section 9 offered broader protections, the case would be analyzed under the Fourth Amendment); *see also Riddle v. State*, 888 S.W.2d 1, 7 (Tex. Crim. App. 1994), *cert. denied*, 514 U.S. 1068 (1995); *Beall v. State*, 237 S.W.3d 841, 845 n.1 (Tex. App.—Fort Worth 2007, no pet.).

*State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).  When, as here, the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings.  *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006).  We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling.  *Id.* at 818.

## B.  Findings of Fact and Conclusions of Law

The trial court made the following findings of fact:

1. On September 24, 2010, Arlington motorcycle patrol officer Sgt. Craig Leondike observed a motor vehicle with an expired paper dealers tag stopped at a red light on Division Street.[2]

2. Sgt. Leondike followed the motor vehicle, which executed a u-turn at the light and pulled into a business parking lot, and he again observed the expired paper dealer[']s tag.

3. Sgt. Leondike pulled in behind the motor vehicle and conducted a traffic stop, identifying [Roberts] as the driver and sole occupant of the vehicle.

4. Sgt. Leondike requested a driver's license from [Roberts], and [Roberts] told him it was suspended.

5. Sgt. Leondike requested proof of financial responsibility, and [Roberts] said that he did not have any because the vehicle was a loaner car.[3]

---

[2]Sergeant Leondike testified that he saw Roberts's vehicle at around 7:25 a.m.

[3]Sergeant Leondike did not recall actually saying the words "financial responsibility" to Roberts but testified that Roberts was unable to produce any personal insurance on any vehicle and that he confirmed that Roberts's driver's

3

6. The City of Arlington has a tow policy which provides that when a vehicle is "stopped on traffic violation where the driver failed to maintain financial responsibility; **and** has previous conviction(s) of FMFR, does not possess a valid driver's license; or has any outstanding warrant," the vehicle shall be towed.[4]

7. Sgt. Leondike requested a confirmation of [Roberts's] driver's license and insurance. Sgt. Leondike received information that [Roberts's] driver's license was suspended and expired, that there was no information [that] the vehicle or [Roberts] had liability insurance, and that the registration on the vehicle was expired.[5]

8. Sgt. Leondike informed [Roberts] that the vehicle would be towed[] pursuant to the tow policy and made arrangements for a tow truck, and began an inventory search.[6]

9. Sgt. Leondike conducted a search of the vehicle pursuant to an inventory policy maintained by the City of Arlington which states that, once the police department takes custody of a vehicle, the condition and contents of the vehicle must be documented.

---

license was suspended and had expired in 2004 and that there was no valid insurance on the car. Roberts testified that he did not have a valid driver's license when he was stopped, that he did not know if there was financial responsibility on the loaner vehicle, and that there was no insurance on the loaner vehicle.

[4]The trial court admitted a copy of the policy as State's Exhibit 28. The policy states that alternatives to towing are not allowed if the vehicle is subject to towing "based on conditions related to the towing of an uninsured motorist policy." The pertinent portion of the section on towing of uninsured motorists is set out below in our analysis.

[5]Sergeant Leondike said that he told Roberts that he was going to be cited for "no insurance, no driver's license, and the registration offense."

[6]Sergeant Leondike said that although he ran a records check to confirm that the vehicle was owned by a body shop, he did not try to contact the business about the vehicle. Roberts stated that Auto Clinic, the vehicle's owner, was not open before 9 a.m.

10.  Sgt. Leondike asked [Roberts] if there were any items of value in the vehicle, and [Roberts] said "no."

11.  Sgt. Leondike opened the trunk of the vehicle with the keys and located a large black bag.

12.  Sgt. Leondike asked [Roberts] if any of the items in the trunk, including the black bag, belonged to him. [Roberts] stated that none of the items were his and that he did not even know how to get into the trunk.[7]

13.  Sgt. Leondike opened the black bag, which held three plastic containers of liquid found to be Gamma Hydroxybutyrate.[8]

14.  Sgt. Leondike located a second backpack in the trunk of the vehicle that contained a baggie found to contain Methamphetamine and a hotel receipt in [Roberts's] name.

15.  Sgt. Leondike completed a pull card as required by the Arlington policy. No items were listed on the back as the only items of requisite value were seized as evidence.[9]

---

[7]Roberts testified that nothing the police found in the trunk was his personal property.

[8]Roberts was arrested after the liquid was field tested.

[9]Sergeant Leondike found three Bunsen burner lighters, a cell phone, and a five-inch glass pipe of the type used for smoking methamphetamine in the vehicle's interior. Although Roberts disclaimed ownership of everything in the trunk, he testified that he had not been allowed to remove his property from inside the vehicle, including a phone, cigarettes, keys to the car, the lighters, and some "adult novelty items."

Sergeant Leondike testified that any items with a value of $20 or more would typically be listed on a pull card and that the wrecker company's driver would receive a copy of it. He stated that he had an inventory list in the form of the pull card but that the pull card did not have any items listed as inventory on it because the items of value were seized as contraband and became evidence and he did not list what would not be left in the vehicle to be taken to the impound yard. He further stated that the items left in the car were miscellaneous items of clothing that did not appear to be of any value, but he agreed during cross-examination that a pair of sneakers found in the vehicle but not listed on

When viewed in the light most favorable to the trial court's ruling, as illustrated by our footnotes containing additional details from the record, we conclude that the evidence supports the trial court's fact findings. *See Kelly*, 204 S.W.3d at 818–19.

In its conclusions of law, the trial court stated that the APD had a policy that allowed for towing Roberts's vehicle and the subsequent vehicle search, including of the locked trunk and containers; that the fact that Sergeant Leondike did not list any property on the back of the pull card did not affect the inventory search's legality; and that the APD's vehicle search was a valid inventory search. We review the trial court's legal conclusions de novo. *See id.* at 818.

## C. Impoundments and Inventory Searches

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). For an impoundment of a vehicle to be lawful, it must be reasonable under the Fourth Amendment. *See Benavides v. State*, 600 S.W.2d 809, 811 (Tex. Crim. App. [Panel Op.] 1980). The State bears the burden to prove a lawful impoundment. *Josey v. State*, 981 S.W.2d 831, 842 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd). A subsequent inventory search is proper when the vehicle's impoundment is proper. *See Benavides*, 600 S.W.2d at 810.

the pull card might arguably be worth more than $20. The pull card was not offered or admitted into evidence.

With regard to the general reasonableness of impoundment, we observe that the expectation of privacy in one's automobile "is significantly less than that relating to one's home or office" and that automobiles are subject to pervasive and continuing governmental regulation and controls, including inspection and licensing requirements. *South Dakota v. Opperman*, 428 U.S. 364, 367–68, 96 S. Ct. 3092, 3096 (1976). In the Driver's License Compact of 1993, Texas declared that the safety of streets and highways "is materially affected by the degree of compliance with state laws and local ordinances relating to the operation of motor vehicles" and that "violation of such a law or ordinance is evidence that the violator engages in conduct which is likely to endanger the safety of persons and property." Tex. Transp. Code Ann. § 523.002(a)(1)–(2) (West 2013). As reflected by this policy, a driver's license—an authorization issued by the Texas Department of Public Safety for the operation of a motor vehicle—is generally required for a person to operate a motor vehicle on our streets; a person commits an offense if he does so after his driver's license has expired or been suspended or revoked. *Id.* §§ 521.001(a)(3), .021, .457(a)(2), (3) (West 2013). Likewise, vehicles are required to be registered, and failure to do so is an offense. *Id.* § 502.040(a) (West 2013 & Supp. 2014), §§ 502.471– .472 (West 2013). And a person may not register or operate a motor vehicle in this state unless financial responsibility is established for that vehicle through a motor vehicle liability insurance policy or certain statutory alternatives. *Id.* §§ 502.041(b), .046 (West 2013), § 601.051 (West 2011) (providing for the

7

requirement of financial responsibility under the Texas Motor Vehicle Safety Responsibility Act); *see also Maricle v. Biggerstaff*, 10 F. Supp. 2d 705, 707 (N.D. Tex. 1998) (stating that the Texas Motor Vehicle Safety Responsibility Act is a facially valid exercise of the State's inherent police power), *aff'd*, 168 F.3d 486 (5th Cir. 1999).

As a condition of operating a motor vehicle to which section 601.051 applies, the vehicle's operator shall exhibit to a police officer on request evidence of financial responsibility.[10] Tex. Transp. Code Ann. § 601.053(a). With the exception of circumstances not applicable here, an operator who does not exhibit evidence of financial responsibility is presumed to have operated the vehicle in violation of section 601.051, which is an offense.[11] *Id.* §§ 601.053(b), .191 (West

---

[10]This evidence may be a motor vehicle liability insurance policy covering the vehicle or a photocopy of the policy; a standard proof of motor-vehicle-liability insurance form prescribed by the Texas Department of Insurance under section 601.081 and issued by a liability insurer for the motor vehicle; an image displayed on a wireless communication device that includes the information required by section 601.081 as provided by a liability insurer; an insurance binder that confirms the operator is in compliance with transportation code chapter 601; a surety bond certificate issued under section 601.121; a certificate of deposit with the comptroller covering the vehicle issued under section 601.122; a copy of a certificate of deposit with the appropriate county judge covering the vehicle issued under section 601.123; or a certificate of self-insurance covering the vehicle issued under section 601.124 or a photocopy of the certificate. Tex. Transp. Code Ann. § 601.053(a)(1)–(7) (West 2011 & Supp. 2014).

[11]A defense to prosecution for failure to maintain motor vehicle liability insurance or otherwise establish financial responsibility is production to the court of one of the documents listed in section 601.053(a) that was valid at the time the offense was alleged to have been committed. Tex. Transp. Code Ann. § 601.193(a) (West 2011). Another defense to prosecution on that offense is that the motor vehicle was in the possession of that person for the sole purpose of

8

2011 & Supp. 2014). "Financial responsibility" is defined as the ability to respond in damages for liability for an accident that "occurs after the effective date of the document evidencing the establishment of the financial responsibility" and "arises out of the ownership, maintenance, or use of a motor vehicle." *Id.* § 601.002(3)(A)–(B) (West 2011).

The pertinent portion of APD's policy on towing of uninsured motorists mirrors the transportation code's requirements, stating:

> **c. Towing of Uninsured Motorists** (Effective 12-01-05). As stated in Section 601 of the Texas Transportation Code, *drivers who operate a motor vehicle without exhibiting evidence of financial responsibility (valid insurance) are violating the Motor Vehicle Safety Responsibility Act. It will be the policy of the Arlington Police Department to tow all vehicles that fall under the following conditions*:
>
>     . . . .
>
> •    *Stopped on a traffic violation where the driver failed to maintain financial responsibility; **and** has previous conviction(s) of FMFR, does not possess a valid driver's license*; or has any outstanding warrant.

---

maintenance or repair and was not owned in whole or in part by the person operating it. *Id.* § 601.194 (West 2011). As Roberts was not convicted here of failure to maintain motor vehicle liability insurance or otherwise establish financial responsibility, his argument that the impoundment was not conducted pursuant to APD's policy when Sergeant Leondike only asked about "insurance" and did not inquire about the other statutory means to show proof of financial responsibility is a nonstarter, particularly in light of Roberts's own testimony that he did not know if he had financial responsibility on the loaner vehicle and that there was no insurance on it because it was a loaner vehicle. Based on Roberts's testimony alone, the trial court could have reasonably concluded that Roberts was without financial responsibility on the vehicle.

9

(1)　　Officers will always ask for *proof* of financial responsibility from all vehicle drivers.

(2)　　Officers will make every effort to verify financial responsibility before authorizing impoundment of the vehicle. A citation may be issued if a person failed to maintain financial responsibility and does not meet any of the above conditions.

(3)　　Officers that tow the vehicle of an uninsured motorist will make a reasonable effort to provide an alternate method of transportation for the driver and their occupants, [i]ncluding but not limited to providing transportation; arranging for transportation; and/or contacting relatives, friends or acquaintances of the towed motorist to provide assistance.[12] [Emphasis added.]

The court of criminal appeals has observed that there are many circumstances under which law enforcement may reasonably impound an automobile, including (1) the driver's arrest when the arrest is reasonably connected to the vehicle; (2) statutory authorization; (3) vehicle abandonment or a vehicle that is hazardous and presents a danger to the public; (4) a reasonable belief that the vehicle is stolen; (5) vehicle removal from an accident scene, and (6) parking violations. *See Benavides*, 600 S.W.2d at 811–12; *see also Opperman*, 428 U.S. at 368–69, 96 S. Ct. at 3097 (noting that in the interest of public safety and as part of a community caretaking function, automobiles are frequently taken into police custody for, among other things, vehicle accidents

_____

[12]Roberts complains that the officer detained him beyond a reasonable time for his citations to be issued, but he does not explain how allowing him to leave immediately after he received his citations would have prevented the police from impounding or inventorying the vehicle. And the trial court could have resolved the conflicts in testimony to conclude that Roberts's girlfriend did not arrive at the scene until after the inventory, at which point Roberts had already been arrested, making his detention harmless.

and other caretaking and traffic-control activities). However, the touchstone of the Fourth Amendment is reasonableness, which is measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 421 (1996); *see Uballe v. State*, No. 07-13-00127-CR, 2014 WL 1829849, at *1–2 (Tex. App.—Amarillo May 6, 2014, no pet.) (holding that impoundment was reasonable when appellant was arrested, no other licensed driver was present to take possession of the vehicle, and appellant did not argue that there were alternatives to impounding the vehicle).

The record reflects that Roberts failed to show proof of financial responsibility when Sergeant Leondike asked for it. Failure to show proof of financial responsibility under transportation code section 601.051 can provide the probable cause necessary to arrest an individual and, depending on the totality of the circumstances, to impound a vehicle. *See Maricle*, 10 F. Supp. 2d at 707–08 (holding that plaintiffs failed to state a claim under § 1983 when their vehicles were impounded under city's "Do Not Drive" and "Towing" policies after they failed to produce current proof of automobile liability insurance); *State v. Morales*, 322 S.W.3d 297, 300 (Tex. App.—Dallas 2010, no pet.) (op. on reh'g) (holding that officer had probable cause to arrest appellant when he failed to provide evidence of financial responsibility); *see also Colorado v. Bertine*, 479 U.S. 367, 368–69 & n.1, 372, 107 S. Ct. 738, 739–40 & n.1, 741 (1987) (upholding impoundment made in good faith under city policy that allowed police to impound vehicles when drivers are taken into custody); *United States v. Crawford*, No.

1:11-CR-00391, 2011 WL 5102391, at *1–2 (N.D. Ohio Oct. 26, 2011) (stating police lawfully impounded vehicle when city's general order on vehicle towing provided that police department controlled vehicle whose driver did not possess a valid driver's license). *Compare United States v. Proctor*, 489 F.3d 1348, 1353–54 (D.C. Cir. 2007) (interpreting *Bertine* to hold that a reasonable, standard police procedure must govern the decision to impound and that when such a procedure exists, the police's failure to adhere to it is unreasonable and violates the Fourth Amendment), *with United States v. Smith*, 522 F.3d 305, 312 (3rd Cir.) (observing that "the adoption of a standardized impoundment procedure merely supplies a methodology by which reasonableness can be judged and tends to ensure that the police will not make arbitrary decisions in determining which vehicles to impound"), *cert. denied*, 555 U.S. 993 (2008),[13] *and United States v. McKinnon*, 681 F.3d 203, 208 (5th Cir. 2012) ("Since *Opperman* and *Bertine*, we have focused our inquiry on the reasonableness of the vehicle impoundment for a community caretaking purpose without reference to any standardized criteria."), *cert. denied*, 133 S. Ct. 980 (2013).

---

[13]The Third Circuit found an impoundment reasonable in *Smith* without reference to any standardized impoundment policy. 522 F.3d at 308. In that case, the police impounded the vehicle because neither its driver nor the appellant was the vehicle's owner or took responsibility for it and because the police planned to contact the vehicle's registered owner, had a responsibility for the vehicle since it was in their custody, and wanted to prevent its theft because it was parked in a location where non-residents' vehicles had experienced damage from vandalism. *Id.* at 308–09.

Here, the vehicle that Roberts had been driving had an expired registration and there was no proof of financial responsibility; therefore, the vehicle could not be driven legally. *See* Tex. Transp. Code Ann. §§ 502.040–.041, .471–.472, 601.051, .053, .191. Further, Roberts could not drive the vehicle—even if it had had current registration and proof of financial responsibility—because he did not have a valid driver's license. *See id.* §§ 521.001, .021, .457. The vehicle did not belong to either Roberts or his girlfriend, who came to pick him up, and the stop occurred around 7:25 a.m., before the vehicle's owner, Auto Clinic, was open for business. Therefore, under the circumstances here, even if the vehicle could have been legally driven, the police had no one at the scene to whom they could safely release it. *See St. Clair v. State*, 338 S.W.3d 722, 724 (Tex. App.—Amarillo 2011, no pet.) (stating that although appellant mentioned that her boyfriend could come retrieve the vehicle, nothing in the record showed that she owned the vehicle and had the authority to approve the manner of its disposition or that the boyfriend was available, would agree to retrieve it, or had a driver's license); *see also Delgado v. State*, 718 S.W.2d 718, 721 (Tex. Crim. App. 1986) (stating that a vehicle may be validly impounded and inventoried when the driver is removed from his vehicle and placed under custodial arrest and no other alternatives are available other than impoundment to insure the vehicle's protection). Additionally, there was no evidence that the vehicle could have properly and safely been left in the business parking lot, and Roberts testified that he did not have permission from the business to leave the vehicle there.

13

*See Johnson v. State*, No. 07-11-00186-CR, 2013 WL 2297038, at *3 (Tex. App.—Amarillo May 21, 2013, no pet.) (mem. op., not designated for publication) ("Without evidence of an invitation or permission from the parking lot owner to leave the vehicle, it was irrelevant whether the department's policy prohibited that option.").[14] We conclude that the trial court did not err by finding the impoundment here reasonable under either the APD's policy or the totality of the circumstances.

Roberts also argues that the inventory search was not conducted pursuant to APD's policy. The court of criminal appeals has long held that an inventory search must not deviate from police department policy. *Moberg v. State*, 810 S.W.2d 190, 195 (Tex. Crim. App. 1991); *State v. Molder*, 337 S.W.3d 403, 406 (Tex. App.—Fort Worth 2011, no pet.); *see also Starlling v. State*, 743 S.W.2d 767, 772 (Tex. App.—Fort Worth 1988, pet. ref'd) (stating that the burden of proving a proper inventory search is on the State and that inventory searches conducted pursuant to standard police procedures are reasonable). The State

---

[14]In *Johnson*, the court concluded that without evidence that the vehicle could have properly been left in the parking lot and without evidence that someone qualified to take possession of the vehicle was at the scene, the trial court did not abuse its discretion by implicitly finding impoundment of the vehicle according to department policy was the only reasonable alternative available to the officers. 2013 WL 2297038, at *3; *see also Bertine*, 479 U.S. at 373–74, 107 S. Ct. at 742 (stating that while giving a driver the opportunity to make alternative arrangements to impounding may be possible, "'[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means.'") (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S. Ct. 2605, 2610 (1983)).

may satisfy its inventory search burden by showing that an inventory policy existed and that the policy was followed.[15]  *Moberg*, 810 S.W.2d at 195; *Molder*, 337 S.W.3d at 410.

The section of the APD's policy on inventory of impounded vehicles states:

> 7.  **Inventory of Impounded Vehicles.**  Once the police department has exercised authority to take custody of a vehicle, the department may be liable for loss or damage that results during the period of custody.  To protect the department from false claims, it is vital that the condition of the vehicle and its contents at the time of taking custody be documented.  A challenge may also be made to the admissibility of any evidence that was seized during an inventory in a criminal prosecution, based on officers' general practice of failing to routinely inventory impounded vehicles.
>       An inventory will therefore be completed on all vehicles taken into custody by the police department as specified in Appendix B.  (Re-numbered and Revised 08-16-99)

Section I.C. of Appendix B requires completion of a pull card, with a copy to the wrecker driver, a copy to the vehicle's owner or operator, and the other copies to be routed to the Property-Evidence Unit.  Section I.D. of Appendix B states,

> *Inventory the vehicle on back of hard copy of pull card*.  If space is insufficient, use the Incident Report form and route it to the Property-Evidence Unit at shift end.  Inventory copies will be kept there for two years in case of claims. . . .  [Emphasis added.]

- Indicate

---

[15]Police inventory procedures "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger," and the Supreme Court has given deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody.  *Bertine*, 479 U.S. at 372, 107 S. Ct. at 741.

* The working condition of the vehicle and observable structural damage;
* The existence of removable equipment such as radio, compact disc/tape players, speakers, and other fixtures, and *all personal items estimated to be valued at $20 or more.* In listing personal property, items may be grouped in categories such as clothing, tools, books, or other general categories. Items that may be of high monetary value, such as cellular telephones or computers, should be specifically listed. Document all property identification and model numbers. [Emphasis added.]

- Closed, unlocked areas or containers are to be opened and their contents described as part of the inventory.
- Locked areas or containers for which there are keys are to be opened and their contents described as part of the inventory. Indicate the disposition of the keys in the inventory.
- Locked areas or containers without keys cannot be opened. Describe them and indicate that they were not opened because of the absence of keys. . . .

Here, Officer Leondike testified that he examined the vehicle's interior and trunk, completed the identifying information on the pull card, and stated that after seizing the drug-related paraphernalia, there were no remaining items valued at $20 or more to list that would travel with the vehicle to the impound lot. Roberts did not testify that any of the items left within the vehicle's interior were worth $20 or more.[16] The State established that an inventory policy existed, and the trial court could have concluded from Sergeant Leondike's testimony that the pull card was completed as required and that the impoundment was not a mere ruse to search the vehicle. *Compare State v. Stauder*, 264 S.W.3d 360, 364 (Tex.

_____

[16]Were there no minimum dollar limit, officers would be reduced to inventorying red Solo cups and pencil erasers.

16

App.—Eastland 2008, pet. ref'd) (affirming suppression when trial court could have concluded that the inventory search was merely a ruse based on the officers' complete failure to fill out any inventory form as required), *with Greer v. State*, 436 S.W.3d 1, 8 (Tex. App.—Waco 2014, no pet.) (holding that the omission of gun and single bullet from inventory listing and failure to itemize items of clothing were not sufficient to establish that the trial court abused its discretion by determining that the inventory policy was followed), *and Scott v. State*, No. 03-10-00258-CR, 2011 WL 6938514, at *3 (Tex. App.—Austin Dec. 30, 2011, pet. ref'd) (mem. op., not designated for publication) (upholding denial of suppression motion when officer testified that he followed policy by filling out inventory form; although State did not introduce the form into evidence, it did not have to when the trial court found the officer's testimony credible). We overrule the remainder of Roberts's two points.

### III. Conclusion

Having overruled both of Roberts's points, we affirm the trial court's judgment.

/s/ Bob McCoy

BOB MCCOY
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: September 18, 2014

17