**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00133-CR**
**NO. 09-24-00134-CR**

_____

**ROCKY ANTHONY GAMEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 22-11-15507-CR, 22-11-15513-CR**

## MEMORANDUM OPINION

In two causes, Rocky Anthony Gamez was indicted for the third-degree felony offense of unlawful possession of a firearm by a felon and first-degree felony offense of possession of a controlled substance with intent to deliver in an amount greater than or equal to four grams but less than 200 grams. *See* Tex. Penal Code Ann. § 46.04(a), (e) (illegal possession of firearm by felon); Tex. Health & Safety Code Ann. § 481.112(a), (d) (possession of a controlled substance with intent to deliver).

1

A jury found Gamez guilty of both offenses, and the trial court found two enhancements "true" then sentenced him to forty years of confinement on each charge to run concurrently. The trial court denied Gamez's Motion to Suppress the search and contents of a backpack found in his vehicle. In a single issue, Gamez challenges the trial court's denial of his Motion to Suppress. Gamez argues that the impoundment of his vehicle and subsequent inventory were unlawful.[1] We affirm the trial court's judgments as discussed below.

## BACKGROUND

After arresting Gamez for driving while license invalid ("DWLI") with a prior DWLI offense, Montgomery County Sheriff's Office ("MCSO") deputies impounded his vehicle for the safekeeping of the property. They then began inventorying the vehicle's contents. During the inventory, one deputy located a camouflage backpack in the backseat of Gamez's vehicle, and upon opening it, observed items including scales and baggies, which the other deputy immediately recognized as contraband. The deputies then proceeded with a probable cause search of the backpack, pulled out substances individually packaged, unlabeled pill bottles,

---

[1]The clerk's records contain signed Orders denying the Motion to Suppress but do not contain the written Motion to Suppress. The trial court referenced a written Motion to Suppress at the hearing, and defense counsel represented to the trial court that she did not know what cause number she filed the Motion in. The State did not object to the lack of a written motion, and the trial court conducted a hearing on the Motion to Suppress. The State agreed that Gamez's arguments made orally at the hearing were specific enough.

2

and a semiautomatic firearm. After a criminal background search revealed a prior felony conviction, the nature of the arrest changed from DWLI to that of the third-degree felony offense of felon in possession of a firearm. Subsequent testing revealed some substances found in the backpack were methamphetamines.

## SUPPRESSION HEARING

Before trial, Gamez filed what was referenced as a "boilerplate" Motion to Suppress, which is not contained in either Clerk's Record on appeal. Following jury selection and before opening statements, the trial court conducted a hearing on the Motion to Suppress. Upon the State's request, the trial court asked Gamez to specify his arguments for the Motion to Suppress at the hearing's outset.

### Gamez's Initial Arguments at the Suppression Hearing

Gamez argued that deputies conducted an "inventory search" of Gamez's car following a custodial arrest, and in the inventory of the car, they found a backpack in the backseat. Gamez cited *South Dakota v. Opperman* and argued that for the inventory to be legal, the impoundment must first be legal; here, he contended that deputies illegally impounded the car, thus the inventory was illegal. *See* 428 U.S. 364, 366–72 (1976). Gamez also noted the automobile's seizure must be reasonable under the Fourth Amendment and cited *Benavides v. State*, then discussed the circumstances in which impoundment would be lawful. *See* 600 S.W.2d 809, 810 (Tex. Crim. App. [Panel Op.] 1980). Gamez asserted the only situation that might

3

apply would be a custodial arrest leading to impoundment, since he was arrested for DWLI.

Gamez argued that the vehicle was legally parked on private property in a gas station parking lot, and deputies failed to ask the property owner whether it could remain there. Gamez claimed deputies could have investigated alternatives to impoundment, including his wife or boss. Even so, Gamez conceded that the policy manual indicates officers do not have to extend their traffic stop but contended there was no "traffic stop" here. Gamez also argued that despite the policy manual, police procedure cannot be used to "whittle away at the Fourth Amendment."

**Testimony of Specialist Jacob Rodgers**

Rodgers testified that he is a deputy specialist with MCSO who works on the Montgomery County Narcotics Enforcement Team. Rodgers explained that on November 12, 2022, he initially conducted a traffic stop on a white van traveling eastbound on Sawdust Road, who failed to indicate a turn onto the southbound feeder of Interstate 45. During the traffic stop, Rodgers developed probable cause to arrest the vehicle's two occupants. He arrested the driver for DWLI and possessing marijuana, and he arrested the passenger for possession of a controlled substance. The van's occupants came from a worksite on Sawdust, and since it was a company vehicle, Rodgers allowed them to call someone to come get the van rather than impound it.

4

During Rodgers's testimony, a copy of his bodycam video was admitted into evidence. Rodgers said that Gamez arrived on the scene in a red RAV4 about ten minutes after his coworkers called him. Gamez parked his red RAV4 in the gas station parking lot about twenty or thirty feet from the van, then Gamez walked up to the scene where Rodgers spoke with him. Gamez "indicated that he was there to take possession of the white work van." Rodgers explained that he allowed the suspects to call Gamez as a courtesy and to not impose an additional hardship; if it does not "unduly extend" the traffic stop, he is willing to do that. Here, Rodgers said that a wrecker would not have arrived for ten or fifteen minutes, so it was "perfectly adequate" since Gamez arrived before a wrecker. It was a faster way to get the individuals he already had in custody off the side of the road.

Rodgers testified that when Gamez arrived, according to the MCSO policy, Rodgers had to identify him by name, date of birth, and identification number of some kind to verify he was releasing the vehicle to a responsible individual who did not have any outstanding license issues. When Rodgers asked Gamez for a driver's license, Gamez returned to his vehicle, then provided a "Texas ID" to Rodgers. Rodgers testified that when Gamez produced the ID, he asked if Gamez had a driver's license. According to Rodgers, Gamez responded that he did not but was working on getting one, so Rodgers told Gamez that he could sit with the vehicle if another licensed driver was on their way. Gamez told Rodgers that his boss was on

5

his way from Houston, so Rodgers responded that Gamez could sit with the two vehicles, "but you cannot leave the parking lot because it's not legal for you to drive without a license." According to Rodgers, if deputies release a vehicle to an unlicensed driver, they must provide that admonishment.

Rodgers testified that he did not initially intend to arrest Gamez even knowing he was driving without a license since Rodgers already had two people in custody and wanted to find the "most expeditious method within reason" to get off the side of the road. He explained that the longer he waited, the greater chance someone would have a medical incident or someone else would cause a problem on the scene. Rodgers changed his mind about arresting Gamez when he ran Gamez's Texas ID card. Rodgers learned that Gamez previously had a license, but it was revoked and rendered ineligible for renewal. When Rodgers scrolled to the bottom of Gamez's driver's license return, he saw that Gamez had multiple prior DWLI convictions, "which enhances it from a Class C citation to a Class B arrestable offense." Rodgers explained that was the same offense that he had someone in custody for. Rodgers described the information contained in the driver's license return, which includes licensure status, speeding offenses, and moving violations; he also explained it was different than running their full criminal history.

Rodgers testified that since he believed Gamez committed the offense of DWLI and had probable cause to believe Gamez drove on public roads from the

work site, Rodgers investigated further. He asked Gamez which public roadways he operated on, and Gamez said he drove on Sawdust and on the Interstate 45 southbound feeder, which Rodgers knew were public roads in Montgomery County. Rodgers then advised Gamez that he committed a Class B arrestable offense, DWLI with a prior, and he arrested Gamez.

The State played portions of Rodgers's bodycam video as Rodgers testified about events shown on the video. Gamez asked Rodgers if someone could come get his car, and Rodgers said he "could look into that." Gamez indicated that a coworker was in route, and Rodgers was trying to responsibly dispose of the two vehicles within a reasonable time now that he had three people in custody rather than two. Rodgers testified that he did not have space to put Gamez in his patrol car with the other suspects.

The video showed that Gamez was on the phone with his wife when Rodgers arrested him, and Gamez wanted his wife to pick up his car. Alternatively, Gamez asked to have his coworker to wait with the vehicle until his wife arrived. Rodgers spoke to Gamez's wife on the phone, who was coming from Cut N Shoot, and Rodgers was "very familiar" with the traffic congestion in that area. Although Gamez's wife said she would be there in twenty minutes, Rodgers knew it would be twenty-five to thirty-five minutes, and he was unwilling to wait that long.

Rodgers described Gamez's wife's demeanor on the phone as "extremely irate, profane, argumentative, and said she threatened to call her lawyer to come and sort me out," and "to bring other people to the scene." According to Rodgers, this was an officer safety concern. Rodgers noted he was responsible for the welfare of the person in custody. Rodgers explained that while the wife did not make overt threats, she was "definitely hostile," so he was uncomfortable with her responding and taking possession of the vehicle. Rodgers said he was unwilling to wait for her to begin with and less willing given her hostility. The crowded parking lot likewise concerned him. When Rodgers learned Gamez's coworker was coming from Houston, he determined that was an unreasonable alternative. So, Rodgers decided to impound both vehicles.

Rodgers testified that with any tow, if deputies have keys, they access the interior and inventory the contents, which they did with both vehicles here. Rodgers inventoried the white van, and Burkett inventoried the RAV4 when he arrived to assist. Rodgers explained that he finished inventorying the white van first, so to expedite things, he offered to help Burkett by calling out items inside the RAV4 as Burkett wrote them out. Rodgers testified that Burkett's inventory was consistent with a typical inventory; he identified valuables to ensure nobody claimed they were missing items later, which mitigated agency and tow lot liability. Rodgers denied looking for contraband and described himself as "pretty ambivalent" about the

vehicles as he wanted to get the three men to jail. As Rodgers approached the RAV4, Burkett began opening a camouflage backpack. Burkett told Rodgers he retrieved the backpack from the baby safety seat in the center of the back seat, within arm's reach of the driver and "in his immediate control." Rodgers said that Burkett pulled a set of digital scales from the backpack and a plastic baggie containing unknown substances, at which point Rodgers angled his flashlight into the bag and observed other items he "assessed to be contraband." Rodgers had not yet seen the gun but believed the backpack contained contraband, so he removed it from Gamez's vehicle and searched it. During the search, he located a semi-automatic firearm.

According to Rodgers, they transitioned from a vehicle inventory to a probable cause search of the backpack upon observing the contraband items. He testified that the inventory is done for "administrative care keeping [sic] purposes" to identify valuables and assure all belongings are accounted for. Rodgers explained it "transitioned to a probable cause search, which is a search for locating and identifying evidence" once he observed the contraband items.

A copy of the MCSO Field Policy and Procedures Manual, Section 3.6 was admitted into evidence at the suppression hearing. According to Rodgers, he could have legally towed the van and explained that when someone is arrested, their policy only provides for two methods of disposition. He said,

> One is to release it to another party, someone who is readily available to take possession of it, typically a passenger in the car who's got a

9

valid license. Alternatively, we can have it impounded and inventoried in order to ensure it doesn't get burglarized or damaged or otherwise vandalized while that person is in custody.

Rodgers testified it makes no difference whether it is on the roadway or on private property. Regarding Section 3.6(C) of the tow policy, Rodgers noted the last sentence regarding towing from private property:

> [T]he same method of the removal for the vehicle and the deputy's responsibilities are the same as the vehicle in a public street right-of-way. It is not incumbent on a deputy to locate the business manager of the parking lot to determine whether or not a driver's vehicle can remain on the property.

Rodgers also read towing guideline policy Section 3.6(L), which states, "Deputy shall conduct an inventory under the following conditions: A, when towing for any reason other than the owner's request; B, when a custody arrest is made and towing is [] required, regardless of the request; and C, when a vehicle is towed to an MCSO facility." Rodgers explained that since the owner did not consent to towing the vehicle, under the policy he had to conduct an inventory upon towing the vehicle. The written policy also provides, "In the case of a non-consent tow, the deputy will complete a vehicle tow slip and conduct an inventory of the vehicle to ensure that no preventable loss will occur concerning perishable and/or valuable items."

**Testimony of Deputy Robert Burkett**

Deputy Robert Burkett testified that he works patrol for MCSO. On November 12, 2022, he received a radio call for backup to help Specialist Rodgers,

10

who advised that he had two suspects in custody and needed Burkett to transport a third suspect. The scene was at a Texaco parking lot at the intersection of Pruitt Road and Interstate 45, and Rodgers's vehicle was behind a white van. Burkett described the gas station and intersection both as "very busy." Burkett explained that truckers park at that gas station to sleep, and there is "a lot of activity 24/7 there in the parking lot."

Burkett said he arrived on the scene at 2:15 p.m., he met with Rodgers, and Gamez was placed in Burkett's backseat. At that point, Rodgers asked Burkett to do the tow slip for Gamez's red RAV4 vehicle. Burkett stated that he was not the one who decided to arrest Gamez, but he helped by handling the tow slip. A copy of the completed tow slip was admitted into evidence. According to Burkett, Rodgers towed the vehicle, and Burkett helped clear the scene as fast as possible. Burkett explained that when he arrived, there were already three suspects in custody. In those situations, they did not want to extend the time of the stop and wanted to get everyone off the scene as quickly as possible.

Burkett testified he was familiar with his agency's towing and inventory policy, which allows them to tow a vehicle if it is a traffic hazard or if it is incident to arrest. Burkett said he followed their process for completing the tow slip and explained they did so to document the items. He noted that it protected the agency from liability and protected the party's items. Burkett denied he looked for anything

11

specific, "only things of value" and listed items they usually included on an inventory, like guns, money, jewelry or tools. Burkett testified he found a camouflage backpack in the rear passenger seat inside a car seat. To his knowledge, Gamez was the only person in the vehicle that day.

Burkett testified that the RAV4 was parked legally in a parking space, and the Texaco gas station was private property. Burkett estimated he was on the scene for about an hour. Burkett said that "if someone's in custody and the vehicle is still on location, we're not going to allow it to stay on location if there's no one to drive it."

**Closing Arguments at the Suppression Hearing**

At the end of the suppression hearing, the State argued: (1) first, there was probable cause to arrest Gamez for DWLI based on him driving to the location and admitting he drove with an invalid license with a prior conviction; and (2) the impoundment was legal because a lawful arrest is a legal means to impound a vehicle. The State explained that the only thing the defense can argue was that the inventory was done improperly, and the things you consider are whether (1) they had an agency policy, and (2) the policy was followed. Here, the State noted the policy admitted into evidence and the completed inventory slip. In sum, the State argued there was a legal arrest, a proper towing, and a proper inventory.

Gamez responded, "The issue here is not whether or not the inventory search was conducted properly, it's whether or not the inventory search should have been

12

allowed at all. The impoundment here is the issue." The defense complained that Gamez was not removed from his vehicle, it was broad daylight, he was legally parked on private property and not a danger, and police did not investigate other alternatives to impoundment.

The State also asserted that Rodgers investigated the reasonableness of alternative methods but contended, "When a driver is arrested, the law does not require police officers to independently investigate possible impoundment alternatives, absent objectively demonstrable evidence that such alternatives exist." The State claimed there was not a reasonable alternative: the wife was irate, profane, and threatened to bring other people to the scene leading to a safety concern for the officer, patrons, and defendants. It noted the other alternative was in Houston forty-five minutes away, but a wrecker could be there in ten or fifteen minutes.

**Trial Court's Ruling**

Based on the testimony and State's Exhibits A, B, and C, the trial court denied the Motion to Suppress. The trial court found: (1) there was a lawful arrest; (2) considering the policy, the same method of removing the vehicle and deputy's responsibilities are the same on public and private property; and (3) this situation evolved into a "traffic stop situation" since—although Gamez voluntarily left his vehicle—he was denied re-entry, so the impoundment was legal based on that. The trial court noted that the deputy looked at alternatives, which he determined to be

13

unreasonable as the wife escalated into a possible safety risk, and the supervisor's timeframe coming from Houston was completely unreasonable. Finally, the trial court found that deputies followed the policies contained in State's Exhibit B.

## TRIAL TESTIMONY AND CONTINUED OBJECTIONS

During trial, the parties questioned the deputies again about the arrest, impoundment, and inventory. Both deputies provided testimony consistent with their testimony at the suppression hearing. Rodgers also testified during trial that he was not required to investigate alternatives to impoundment; whether to do so was within the deputy's discretion. He explained that they were responsible for the suspects' safety once in custody, and the deputies' priority was transporting them to jail without extending the stop. Rodgers said they were in a high-traffic parking lot in an area where they have problems with burglaries of motor vehicles. Among other evidence, the bodycam from both deputies was admitted at trial.

Gamez also repeatedly objected at trial that the initial inventory was "illegal" and cited 38.23. *See generally* Tex. Code Crim. Proc. Ann. art. 38.23. Gamez did not complain or specify at trial that the inventory was illegal because MCSO did not have inventory policy regarding opening closed containers nor that if there was such a policy, the deputies failed to adhere to it.

14

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *See Brodnex v. State*, 485 S.W.3d 432, 436 (Tex. Crim. App. 2016); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We give almost total deference to the trial court's determination of historical facts, especially when the trial court's fact findings turn on the witnesses' credibility and demeanor. *See Brodnex*, 485 S.W.3d at 436 (quoting *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010)). We afford the same deference to the trial court's rulings on applying the law to questions of fact and to mixed questions of law and fact, if resolution of those questions depends on an evaluation of the credibility and demeanor of witnesses. *See Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013) (citation omitted). We review de novo mixed questions of law and fact that do not depend on credibility and demeanor. *Id.* (citation omitted).

At a suppression hearing, the trial court is the exclusive trier of fact and judge of the witnesses' credibility and weight to give their testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). At the hearing, a trial court may choose to believe or to disbelieve all or part of a witness's testimony. *See Baird v. State*, 398 S.W.3d 220, 226 (Tex. Crim. App. 2013). When the trial court does not make express findings of fact, we must view the evidence in the light most favorable to the trial court's ruling, assuming it made any implicit findings of fact that are

15

supported by the record. *See Crain*, 315 S.W.3d at 48. Neither party moved for written findings of fact and conclusions of law, and none were filed, yet the record makes apparent that the trial court intended to express its findings and conclusions based on its oral pronouncements. When reviewing a motion to suppress, oral findings of fact can be considered as findings of fact on the record and are given due deference. *See, e.g., State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (stating that the trial court's findings and conclusions from the suppression hearing must be recorded in some way, whether written and filed by the trial court or stated on the record at the hearing); *Flores v. State*, 177 S.W.3d 8, 13–14 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (reviewing trial court's oral findings of fact on a motion to suppress).

Appellate review is generally limited to evidence introduced at the suppression hearing. *Igboji v. State*, 666 S.W.3d 607, 612 (Tex. Crim. App. 2023); *Turrubiate v. State*, 399 S.W.3d 147, 150–51 (Tex. Crim. App. 2013). Yet, our review "may include evidence adduced at trial when, as here, 'the suppression issue has been consensually relitigated by the parties during trial on the merits.'" *Turrubiate*, 399 S.W.3d at 151 (quoting *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996)).

## LAW: IMPOUNDMENT AND INVENTORY

The United States Constitution and the Texas Constitution protect against unreasonable searches and seizures. *See* U.S. CONST. amend. IV; Tex. Const. art. I, § 9. A warrantless search is presumptively unreasonable "subject to a 'few defined and well-established exceptions.'" *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993)). An inventory search is an exception to the Fourth Amendment's warrant requirement. *See Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (stating that an inventory search may be reasonable even though conducted without a warrant when the search is performed based on police caretaking procedures); *Opperman*, 428 U.S. at 366–72 (explaining that following impoundment inventories under standard police procedures are reasonable). "However, before any need arises to inventory the contents of an automobile there must be a lawful impoundment." *Benavides*, 600 S.W.2d at 810.

"For an impoundment of a vehicle to be lawful, it must be reasonable under the Fourth Amendment." *Roberts v. State*, 444 S.W.3d 770, 774 (Tex. App.—Fort Worth 2014, pet. ref'd) (citing *Benavides*, 600 S.W.2d at 811). An impoundment is lawful if a driver is removed from his vehicle, arrested, and no other alternatives are available other than impoundment to ensure the vehicle's protection. *See Benavides*, 600 S.W.2d at 811. The State bears the burden of proving that an

17

impoundment is lawful. *Delgado v. State*, 718 S.W.2d 718, 721 (Tex. Crim. App. 1986). Factors we consider in determining an impoundment's reasonableness under the Fourth Amendment when it follows custodial arrest include whether:

> (1) someone was available at the scene of the arrest to whom police could have given possession of the vehicle; (2) the vehicle was impeding the flow of traffic or was a danger to public safety; (3) the vehicle was locked; (4) the detention of the arrestee would likely be of such duration as to require police to take protective measures; (5) there was some reasonable connection between the arrest and the vehicle; and (6) the vehicle was used in the commission of another crime.

*Josey v. State*, 981 S.W.2d 831, 842 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (citing *Gords v. State,* 824 S.W.2d 785, 787–88 (Tex. App.—Dallas 1992, pet. ref'd)); *see also Garza v. State*, 137 S.W.3d 878, 883 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (stating same). "Texas courts have generally found impoundment to be reasonable when the driver was alone when arrested or when passengers could not show they were licensed drivers." *Yaws v. State*, 38 S.W.3d 720, 724 (Tex. App.—Texarkana 2001, pet. ref'd). Police are not required to contact a friend or relative of the accused to take possession of the vehicle. *See id.*; *see also Moskey v. State*, 333 S.W.3d 696, 700 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

An inventory search protects (1) the owner's property while in police custody, (2) the police against claims or disputes over lost, stolen, or vandalized property, and (3) the police from potential danger. *See Bertine*, 479 U.S. at 372; *Opperman*, 428

18

U.S. at 369 (citations omitted). Issues of probable cause do not apply to an inventory search because an inventory is not to investigate criminal activity, rather it fulfills an administrative purpose. *See Bertine*, 479 U.S. at 371 (quoting *Opperman*, 428 U.S. at 370 n.5) (explaining the inventory-search exception focuses on "the reasonableness of routine administrative caretaking functions[ ]"); *see also State v. Cruz*, 461 S.W.3d 531, 542 (Tex. Crim. App. 2015) (noting that the inventory search exception is based on administrative concerns) (citations omitted). To satisfy the exception, an inventory search must be conducted pursuant to a reasonable standardized police procedure. *See Moskey*, 333 S.W.3d at 700 (citing *Bertine*, 479 U.S. at 371) (other citations omitted). "The inventory search must be designed to produce an inventory of the vehicle's contents and must not be a 'ruse for a general rummaging in order to discover incriminating evidence.'" *Id.* (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)) (other citation omitted).

The State bears the burden of establishing that the police conducted a lawful inventory search. *Id.* (citing *Evers v. State*, 576 S.W.2d 46, 50 & n.5) (Tex. Crim. App. 1978)) (other citations omitted). The State satisfies its burden by demonstrating that (1) an inventory policy exists, and (2) officers followed that policy. *Id.*; *see also Moberg v. State*, 810 S.W.2d 190, 195 (Tex. Crim. App. 1991). Opening closed containers while conducting an inventory search is lawful only when there is evidence of a policy or established procedure allowing for it. *State v. Molder*, 337

19

S.W.3d 403, 409 (Tex. App.—Fort Worth 2011, no pet.) (citing *Wells*, 495 U.S. at 4–5; *Rothenberg v. State*, 176 S.W.3d 53, 57 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd)) (other citation omitted).

## ANALYSIS

In a single issue, Gamez complains the trial court reversibly erred when it denied his Motion to Suppress. In support of this issue, Gamez raises two arguments. First, he challenges the impoundment. Second, he challenges the inventory on the basis that the State did not establish a policy for opening closed containers. We take each of these in turn.

### Impoundment

Gamez contends that the impoundment of his vehicle was unlawful because (1) a traffic stop did not occur, (2) he was not removed from his vehicle, and (3) other alternatives existed to ensure the vehicle's protection. Relying on *Benavides*, he primarily contends that there was no traffic stop, he was not removed from the vehicle, and other alternatives existed to protect his vehicle, including his wife and coworker. He notes that his vehicle was parked legally on private property.

*Benavides* involved a case where the appellant's wife suffered a fatal gunshot wound, and he sustained a gunshot wound but lived; they were found in their garage. *See Benavides*, 600 S.W.2d at 810. The appellant was taken to a hospital. *See id.* By asking a family member, police determined what kind of car appellant drove, then

20

located a car matching that description two blocks away. *See id.* The car was impounded and inventoried, and evidence from the inventory was used at the appellant's trial. *See id.* The State's sole basis for impounding the car was "safekeeping." *Id.* at 811. The State asserted it was standard policy to impound a vehicle when the accused had been arrested, and they claimed they were "reasonably sure" it belonged to the appellant. *See id.*

The Court of Criminal Appeals rejected the impoundment in *Benavides* purportedly done for "safekeeping" reasons. *See id.* at 812. The Court said, "The mere arrest of a defendant cannot be construed to authorize the seizure of his automobile when the arrest took place two or more blocks away from the automobile." *Id.* The Court noted that there was no evidence the car was impeding traffic flow or was a danger to public safety. *Id.* "It was legally parked in a residential neighborhood, and it was locked." *Id.*

Gamez seemingly asserts that the circumstances listed in *Benavides* where impoundments have been determined to be lawful are exclusive, yet the Court of Criminal Appeals explained the cited cases "do not include every basis that an impoundment has been upheld[.]" *Id.* at 811. A recognized reason for lawfully impounding a vehicle can be the "community caretaking" function. *Id.* at 810 (quoting *Opperman*, 428 U.S. at 478).

21

The circumstances of the impoundment here are distinguishable in several key respects from those in *Benavides*, and the evidence of these circumstances supports the impoundment's reasonableness when we consider the relevant factors. *See Josey*, 981 S.W.2d at 842 (listing factors courts consider for impoundment's reasonableness); *see also Garza*, 137 S.W.3d at 883 (same). Although Gamez voluntarily exited his vehicle, Rodgers observed him do so, and the vehicle was in the immediate area. *See Garza*, 137 S.W.3d at 883; *Josey*, 981 S.W.2d at 842. Gamez committed the offense of DWLI by driving the vehicle to the scene. *See Garza*, 137 S.W.3d at 883; *Josey*, 981 S.W.2d at 842. While Gamez claims he was legally parked on private property, testimony established it was a high-traffic parking lot in an area where vehicle burglaries were a problem. *See Garza*, 137 S.W.3d at 883; *Josey*, 981 S.W.2d at 842. The evidence establishes that nobody was on the scene of the arrest who could take possession of the vehicle. *See Garza*, 137 S.W.3d at 883; *Josey*, 981 S.W.2d at 842. There was a reasonable connection between the initial arrest for DWLI with a prior and the vehicle, which was the basis for the original decision to impound the vehicle. *See Garza*, 137 S.W.3d at 883; *Josey*, 981 S.W.2d at 842.

We reject Gamez's contention that deputies were required to independently explore or use alternatives to impounding his vehicle. *See Moskey*, 333 S.W.3d at 700 (stating the State need not prove impoundment and subsequent inventory was the least intrusive means of securing and safeguarding the vehicle, nor must it prove

22

that the officers investigated possible alternatives to impoundment); *Yaws*, 38 S.W.3d at 724 (explaining that courts have not required police to contact an accused's relative or friend to come to the scene to take possession of the vehicle). Evidence supported the trial court's finding that MCSO had a towing policy and that deputies followed this policy. *See Moberg*, 810 S.W.2d at 195. The policy allowed for only two dispositions of a vehicle when someone was arrested, whether on public or private property. They could release it to a responsible private party readily available, or they could impound and inventory the vehicle. The evidence established that deputies had discretion whether to explore alternatives before impounding the vehicle after an arrest. Although not required to do so, the evidence showed that Rodgers investigated Gamez's wife and coworker as possible alternatives and determined they were unreasonable options. Rodgers had three people in custody in a high-traffic area, and their policy emphasized expeditiously transporting those individuals safely to jail over extending a traffic stop. Rodgers explained that the wife was hostile, belligerent, and threatened to bring others to the scene. Additionally, both the wife and coworker would take too long to arrive at the scene.

Gamez notes that he was not removed from the vehicle and approached Rodgers, but Texas courts have upheld impoundments when defendants voluntarily exited their vehicle before arrest. *See, e.g., Delgado*, 718 S.W.2d at 720 (upholding

23

impoundment where defendant was outside his vehicle in a motel parking lot when officers approached him and arrested him after observing narcotic paraphernalia); *Mayberry v. State*, 830 S.W.2d 176, 180 (Tex. App.—Dallas 1992, pet. ref'd) (holding impoundment lawful where officers arrested defendant after he parked in private driveway and exited the vehicle); *Starlling v. State*, 743 S.W.2d 767, 772 (Tex. App.—Fort Worth 1988, pet. ref'd) (concluding impoundment and inventory were lawful when defendant was standing next to his car parked in a restaurant parking lot and arrested on suspicion of burglary and impoundment was necessary to secure the vehicle); *see also Mitchell v. State*, No. 09-05-289-CR, 2006 WL 2075204, at *1 (Tex. App.—Beaumont July 26, 2006, no pet.) (mem. op., not designated for publication) (concluding impoundment was lawful where defendant parked in barbershop parking lot and as he exited a vehicle, officers approached and arrested him on an outstanding warrant).

Viewing the evidence in the light most favorable to the trial court's rulings, we hold the evidence supports the trial court's findings, and the trial court correctly concluded the impoundment was lawful. *See Delgado*, 718 S.W.2d at 721, *Benavides*, 600 S.W.2d at 810; *Garza*, 137 S.W.3d at 883; *Josey*, 981 S.W.2d at 842; *see also Crain*, 315 S.W.3d at 48 (stating standard of review). We overrule Gamez's issue as it relates to the impoundment.

**Inventory**

On appeal, Gamez asserts that even if the impoundment was legal, the inventory was still unlawful because there was no standard procedure regarding the inventory of closed containers found in a vehicle based on the evidence admitted during the suppression hearing. The State responds that Gamez waived his argument that the inventory of his vehicle was conducted improperly. We agree with the State that Gamez waived this argument.

To preserve a complaint for our review, a party must make a timely objection or motion in the trial court stating the grounds for the ruling he sought with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were clear from the context. *See* Tex. R. App. P. 33.1; *Pena v. State*, 285 S.W.3d 459, 463 (Tex. Crim. App. 2009). To avoid forfeiting his complaint, the objecting party must "'let the trial judge know what he wants, *why* he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'" *Pena*, 285 S.W.3d at 463 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)) (emphasis added). The complaint on appeal must comport with the complaint made at trial. *Id.* A general or imprecise objection can be sufficient to preserve error only when "the legal basis for the objection is obvious to the court and to opposing counsel." *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006).

25

At the hearing on the Motion to Suppress, Gamez expressly represented to the trial court that he was not complaining about how the inventory was conducted. Rather, his complaint was that deputies did not lawfully impound his vehicle, thus the subsequent inventory was illegal. During trial, Gamez repeatedly said he wished to "renew" his objection to the inventory as being illegal and cited 38.23. He did not complain in the trial court that the inventory was unlawful because there was no standard procedure regarding closed containers found in a vehicle based on the deputies' testimony and the policy admitted during the suppression hearing. *See* Tex. R. App. 33.1. Gamez failed to alert the trial court that he was entitled to the exclusion of evidence because the agency did not have a standard procedure, which he contends resulted in an illegal inventory. Nothing in the record shows that the trial court or the State recognized that Gamez's reason for claiming the inventory was illegal was the lack of a standard procedure about opening closed containers. *See Buchanan*, 207 S.W.3d at 775. Since his complaint in the trial court does not comport with his complaint on appeal, we hold that he has failed to preserve this complaint about the inventory for our review. *See Pena*, 285 S.W.3d at 463; *Lankston*, 827 S.W.2d at 909.

**CONCLUSION**

Having overruled Gamez's sole issue regarding the impoundment and having concluded he failed to preserve his complaint about the inventory, we affirm the trial court's judgments.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on January 26, 2026
Opinion Delivered March 18, 2026
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.

27